Plaintiff-appellant Jeffrey R. Beck, M.D. (d.o.b. October 21, 1953; "husband")[1], appeals from the trial court's determination of child support, spousal support and award of attorney fees. For the reasons adduced below, we affirm.
A review of the record on appeal indicates that plaintiff and defendant-appellee Carol Beck, M.D. (d.o.b. March 30, 1953; "wife")[2], were married on November 9, 1980. Two children, a boy (Brian Joel Beck, d.o.b. March 10, 1983) and a girl (Jessica Rachel Beck, d.o.b. October 23, 1990), were born as issue of the marriage.
The facts indicate that the parties enjoyed a comfortable standard of living during the term of the marriage. The family frequently enjoyed vacations, cultural events, restaurant dining, new cars and other accouterments of professional and financial success. The children both were enrolled at Hawken School, a private educational institution whose monthly tuition per child was $2,166. The children enjoyed summer camps and enrichment programs. The parties' son is skilled at playing chess and travels to compete in chess tournaments. The marital home is located at 26463 Hendon Road, Beachwood, Ohio, and was valued in 1996 at $330,000, but due to a mortgage in the amount of $276,618, the home's net equity was $53,382.
Husband filed a complaint for divorce on May 17, 1996. The parties separated on June 1, 1996, when husband moved out of the marital home. At the time of their separation, the parties acknowledged marital debts on credit cards totaling $129,726 (note, this debt does not include real estate mortgages or car loans) which represented credit card debt of $78,783 by husband, and $50,943 by wife, but disputed other additional credit card charges through an MBNA Bank account as marital debt. See Magistrate's Report at findings of fact 14-16.
The case was heard before a Magistrate from January 8 to 12, 1998. On May 20, 1998, the Magistrate issued her report and recommendation, a copy of which is attached to appellant's brief.[3] Pertinent to this appeal, the Magistrate's Report contained the following findings of fact and conclusions of law:
 In the order for support pendente lite journalized on November 1, 1996, at Vol. 2893, Pg. 802 et seq., effective June 18, 1996, Plaintiff was ordered to pay a total of $6,430 per month as temporary child and spousal support to Defendant as well as to pay the mortgage and other payments and Defendant was ordered to pay the utilities for her residence. All payments have been made in accordance with the order between the date of journalization thereof and the date of contested trial. As to the period between June 18, 1996, and October 31, 1996, a period of four months plus thirteen (13) days in June, Plaintiff should have paid a total of $28,506 ($6,430 times 4 plus $2,786) Plaintiff demonstrated payment of a total of $22,987.59 to Defendant or on her behalf (Plaintiff's Exhibits 1 and 4) as follows: Crediting Plaintiff for the 13 June days as a portion of the $7,000 paid by check dated June 6 ($3,033) a total of $18,533 in direct payments by check, $1,243.26 in utility payments, $1,149.54 in car payments, $1,153.42 in payments of credit cards shown by Defendant in her brief in support of her request for temporary support as debts in her name to be paid by her, and $908.37 in payments of Defendant's cellular telephone shown as an expense in said brief. (An additional direct payment of $225 was acknowledged by Plaintiff to have been a sum due to Defendant for her one-half of a cashed Israel bond.) In addition, however, Defendant paid the mortgage payment on the marital residence for the months of July and August of 1996, a total of $4,352. Accordingly, there is an arrearage under the order for support pendent lite in the amount of $9,870.41 ($28,506 due minus $22,987.59 paid plus $4,352 due), which arrearage should be retired by Plaintiff's payments to Defendant in monthly increments in addition to current child and spousal support as ordered hereinbelow.
* * *
 PURSUANT TO OHIO REVISED CODE 3109.05 AND 3113.215, the Magistrate makes the following findings of fact:
 1. As set forth in Joint Exhibit 1, #4, Plaintiff, a physician, had gross earnings in 1994 of $306,309, in 1995 of $368,180, and in 1996 of $430,831. As of November 30, 1997, Plaintiff had received $352,732.16 from Acute Care Specialists, Inc. (Plaintiff's Exhibit 16). For work performed in December, he received $3,420 from Weatherby Locums, Inc. (Plaintiff's Exhibit 17) and he testified he was due about $14,400 from Acute Care. His 1997 gross earnings, accordingly, were at least $370,552. The average of these four most recent complete calendar years is $368,943, an appropriate sum to use for the calculation of child support at present, any other figure being highly speculative due to Plaintiff's changing employment situation (see Finding #34 below). Plaintiff is self-employed. His 1996 tax return (Plaintiff's Exhibit 18) showed $14,560 in ordinary and necessary business deductions.
 2. As set forth in Joint Exhibit 1, #5, Defendant is a licensed physician. She is board certified in pediatrics, but she has not been employed at all since 1990. Defendant clearly has employment potential and occupational qualifications; however, she has no recent work history. In addition, there was little evidence of prevailing job opportunities and salary levels for any work for which she might presently be eligible (see Findings #35 to #38 below, with each witness having testified about substantial periods of time being necessary for Defendant to be retrained and/or to engage in a job search) (O.R.C. 3113.215(A)(5)(a)). Plaintiff's argument that income should be imputed to her being not well taken, it is appropriate to use a zero sum for purposes of computation of child support.
 3. As set forth in Joint Exhibit 1, #16 and #17, both of the children have attended private schools throughout their school lives, both have attended camps and other summer enrichment programs, and Brian is a nationally ranked chess player, involved in extensive traveling for chess competitions. Both parents testified about Brian's special gifts in math. His skills could lead toward college scholarships, and it is to his benefit to go to school where he can appropriately develop them. Plaintiff believes such to be available in the Beachwood public schools, but he offered no evidence about the math program there. He also acknowledged that a previous school attended by the boy failed "to deliver on its promises to advance his math gifts." Defendant wishes Brian to continue at Hawken, which, both parties acknowledge, has been providing excellent educational development for him. Tuition costs for both children at Hawken are $2,166 per month. Defendant also listed as monthly expenses attributable specifically to the minor children on Defendant's Exhibits Z and AA $150 for temple and religious school, $400 for children's travel, $60 for chess lessons, and $20 for Internet. She seeks a deviation from the computed child support for purposes of meeting the tuition cost as well as these other expenses.
 4. During this marriage the parties' standard of living permitted them to go out to dinner as desired, to live in a nice house, to have nice clothes and nice cars, to take vacations, etc. Had this marriage continued, the standard of living the children would have enjoyed would have been commensurate therewith. However, this lifestyle and standard of living at present finds the parties with well in excess of $100,000 in debts (see Finding #17 below).
 5. The children have no physical or emotional ailments. However, each of the children is in counseling, Brian having started in late 1995 when his parents were having marital problems. According to Defendant, one-half (1/2) of the cost of about $100 per session is paid by insurance.
* * *
 7. As shown by Plaintiff's Exhibit 18, Plaintiff's claiming of the personal exemptions for the children in 1996 had no effect upon his taxes due to his high income. Similar circumstances would produce similar lack of effect for 1997 and thereafter.
 8. The Health Insurance Investigative Form, signed by the parties and filed on January 14, 1998, shows Plaintiff, as self-employed, to have Prudential HMO health insurance with a marginal out-of-pocket cost of $350.96 per month or $4,211.52 annually. Defendant has no family plan health insurance available to her through any employer or other group.
 PURSUANT TO OHIO REVISED CODE 3109.05 AND 3113.215, the Magistrate makes the following conclusions of law:
 Pursuant to O.R.C. 3113.215(B)(2)(b), the combined gross income of both parents being in excess of $150,000 per year, the amount of child support to be paid must take account of the needs and standard of living of the children and of their parents. Said child support should be no less than the same percentage of the parents' combined annual income computed on a child support worksheet for a gross income of $150,000. In accord with the child support computation worksheet (attached hereto as Exhibit A and incorporated herein), Plaintiff's computed annual obligation should be at least $21,971.
 To take account of the needs and standard of living of the children and their patents, ordering the basic computed sum would be unjust or inappropriate and not in the best interest of the children due primarily to the need and capacity of the children for an education and the educational opportunities which would have been available to them had no need for court-ordered support arisen (O.R.C. 3113.215(B)(3)(n)). Also to be considered are the following additional deviation factors:
 The special and unusual needs of the children (O.R.C. 3113.215(B)(3)(a)); the present disparity in income between the parties (O.R.C. 3113.215(B)(3)(g)); other court-ordered payments (O.R.C. 3113.215(B)(3)(c)); and amounts of taxes actually to be paid by the parties (O.R.C. 3113.215(B)(3)(i))
 Therefore, Plaintiff should be ordered to pay child support to Defendant in accord with the computation worksheet in the sum of $2,000 per month per child, plus 2% processing charge.
* * *
 PURSUANT TO OHIO REVISED CODE 3105.171, the Magistrate makes the following findings of fact:
* * *
 10. Defendant has as her separate property a $6,000 certificate of deposit in Georgia, which was traced to accounts she held prior to the marriage.
* * *
 13. Plaintiff is the owner of a life insurance policy on the life of another, namely his mother. She sends him funds to pay the premiums thereon. No evidence was offered concerning the value, if any, of this asset; therefore, it is found to be of negligible value in regard to property division determinations.
* * *
 15. The parties disputed how much of the debt charged on an MBNA account was marital. On the 6/12/96 billing (Plaintiff's Exhibit 9) the previous balance was $7,895.58. Defendant acknowledged this sum plus a charge of $2,697.62 to be marital. However, of the $6,651.58 appearing as charges in the billing period, a total of $753.13 was incurred by Plaintiff solely for himself and the rest was incurred for family purposes. The marital total was, accordingly, $13,794.03. On the billing statement for 7/12/96, it was shown Plaintiff paid $289 on this account and an additional $1,668.63 was charged, of which $433.42 was clearly acknowledged as marital. This debt is found to be $14,227.45.
 16. An additional debt was listed on Exhibit C to Joint Exhibit 1 and on Defendant's Exhibit Y as $601 owed to Sams. There was no evidence presented concerning any assertion that said debt was incurred other than for marital purposes.
 17. Therefore, excluding the mortgages and the automobile loans, the marital debt as of date of separation is found to total $144,554.45. Of said sum, $93,611.45 of said sum was in Plaintiff's name and $50,943 was in Defendant's name.
 18. Since the separation of the parties, Plaintiff has been paying at least the minimum payment due on each credit card in his name. No suits or demand notes exist. Present balances on debts in his name total $82,748.52 (see Exhibit A to Joint Exhibit 2) with monthly payments listed totaling in excess of $2,000. He has paid all medical bills for the children since separation and has paid $185 per month since early 1997 to an orthodontist for services to the older child.
 19. As set forth on Exhibit B to Joint Exhibit 2, present balances on debts in Defendant's name total $54,547.17 (slight mathematical error on exhibit). Three debts have been paid in full; eight accounts have been closed and payments are being made monthly; and one debt is in suit. Defendant's monthly payments total $1,375 (see Defendant's Exhibit AA).
 20. The parties were not in agreement as to the characterization of sums receives from Plaintiff's parents, $75,000 in May of 1981 and $9,000 in the fall of 1981. Plaintiff called both loans while Defendant described both as gifts, the first to both of them with the note being for the purpose of avoiding gift taxes, the second to Plaintiff for purposes of buying a new car. Plaintiff's Exhibit 8 is a copy of a demand note for $75,000, signed by both parties, and copies of a verification stub of a $9,000 cashier's check and a note written by Plaintiff thanking his parents for "the loan to buy the Cressida". Except for a "nasty" letter to both of the parties in 1992 when there was a "blow-up" between Plaintiff and his mother, no demand has ever been made for repayment. Defendant characterized the $75,000 note as an ill-advised estate planning device. These alleged debts were never disclosed by the parties to others, e.g., on a loan application where debt was shown (Defendant's Exhibit H) nor, until they were presented during contested trial, were they listed on any documents filed in the within action nor on the joint exhibit listing the debts of the parties.
 21. Defendant presented evidence of a total of $6,100 in loans from her mother between 9/16/96 and 2/26/97 (Defendant's Exhibit R). Said debt was incurred to meet household expenses and to pay expenses of this litigation.
* * *
 24. It is desirable to award the family home to Defendant as she will be the residential parent of the minor children. The family has resided therein since early in 1987, and the children have many ties to the immediate neighborhood and community.
 25. Approximately $30,000 of the marital assets are liquid presently. The remaining assets are the real property, the two motor vehicles, the personal property, SEP's, IRA's, and pensions.
* * *
 27. No evidence was presented concerning tax consequences of the property division upon the respective awards to be made to each party. However, should the retirement benefit type of asset be converted to cash at this time, the parties would incur substantial taxes and penalties.
 28. It is not necessary that any asset be sold to effectuate an equitable distribution of property.
 29. The only division of property made in an agreement of the parties was that of the automobiles and the personal property as set forth above.
* * *
 PURSUANT TO OHIO REVISED CODE 3105.18, the Magistrate makes the following findings of fact:
 30. Defendant seeks an award of spousal support. She testified concerning her request for an award for a period of seven years in order for her to "recover" from fifteen years away from career development as she met family responsibilities. The major focus of the evidence presented on behalf of Defendant concerned the lost income production capacity she has experienced due to her marital responsibilities (O.R.C. 3105.18(C)(1)(m)).
* * *
 33. When the parties met, they had each completed their medical degrees and were in a pediatric residency program in Cincinnati. After their marriage, they both had fellowships in pediatric cardiology at Rainbow Babies and Children's Hospital in Cleveland. Although both parties testified they each left the program before its completion and Defendant testified they both left the program after six (6) months and on December 31, 1981, Plaintiff testified he completed one year of this fellowship.
 34. Thereafter, Plaintiff worked as staff emergency physician first for Lakewood Hospital (3 years), then Youngstown Hospital Association (4 months), then Suburban Hospital (3 years), then St. Alexis Hospital (3 years). From 1990 until the end of December of 1997 he worked as an independent contractor with Acute Care Specialists, a contract service providing doctors to hospitals. He was staff physician in the emergency department and residential coordinator for Fairview Hospital, where his hourly rate was $95, and later was at Elyria Medical Center, where his hourly rate was $120. In 1996 Plaintiff received gross compensation, as set forth on his Schedule C of Form 1040, in the amount of $430,831 (Plaintiff's Exhibit 18). Dividing said sum by 12 months and $120 per hour suggests he worked nearly 300 hours each month in 1996. However, he testified that in May of 1997 he was working about 20 shifts or 240 hours a month and that he was called into an intervention meeting that month and told he was "impaired due to depression," his hours would be cut by 25%, and he was to see a counselor and to take medication. His credibility concerning these matters was severely impaired by the fact that in deposition in October he had testified he did not know why his hours were cut, his health was good, and although he had been previously treated for depression, he was not then taking medication therefor. He continued to work through Acute Care and supplemented his income through Weatherby Locums, Inc., although he also testified he did not try to make up time by working elsewhere as his employers and his psychologist advised against it as detrimental to his mental health and/or that he was contractually prohibited from working elsewhere. However, his contract with Acute Care Specialists, Inc. (Defendant's Exhibit F) contained no such absolute restriction. Although he testified his hours were cut to only 170 or 180, in November of 1997 he worked 196.75 hours at the $120 per hour rate and his year-to-date gross was $352,732.16 (Plaintiff's Exhibit 16). In addition he worked through Weatherby Locums, Inc., e.g., in December for three 12 hour days in Ashtabula, Ohio, at $95 per hour, or $3,420, plus mileage reimbursement (Plaintiff's Exhibit 17). He also was still to be paid about $14,400 for shifts he worked in December through Acute Care. Plaintiff's 1997 gross income is, therefore, a total of at least $370,552.16. Since May, or earlier, he has actively sought other employment. Under the terms of the employment agreement for a position he accepted in Brooklyn, New York, dated May 1, 1997, Plaintiff was to commence his work there on November 1, 1997, and his total compensation would have been $189,600 annually (Plaintiff's Exhibit 14). However, in early fall he went to New York and decided not to take the job. He has since been offered a position in Roanoke, Virginia, where his compensation would be a salary of $169,000, plus incentive bonus up to $25,000. At time of trial he was also thinking about applying for a position in Winchester, Virginia, where his salary would be $181,000 per year (Plaintiff's Exhibit 15). Plaintiff testified he would be doing "locum tenums" work for three weeks in January of 1998 in Savannah, Georgia, at $130 per hour. To date of trial Plaintiff has had four (4) job interviews and he was anticipating others in Pittsburgh, the State of Connecticut, and at Duke University. He wishes to leave Ohio and has sought only temporary positions in this State. Even if Plaintiff's argument proves to be a correct prediction and he only earns $95 per hour, his anticipated gross income would be approximately $200,000, assuming standard forty (40) hour weeks, to which would be added whatever overtime he is able to work. Obviously, determining Plaintiff's 1998 earnings is speculative at best, given his employment circumstances at time of contested trial and noting Defendant's argument that he has always been able to secure better paying positions throughout his employment history.
 35. Defendant worked as a staff pediatrician at St. Luke's Hospital for six (6) months, and then, intermittently and part-time, first at Fairview Hospital and later at Kaiser Permanente where she saw out-patients in a general pediatric clinic. As set forth by her on Defendant's Exhibit P, her gross income (either from W-2 earnings as an employee or on Forms 1099 as self-employed) was comparable to Plaintiff's through 1981. In 1982, she earned $20,582 (as compared to Plaintiff's $51,799), her last full time work in clinical practice having been in June. In 1983 she earned $2,519.25, the first child of the parties having been born in March. She had no earnings whatsoever from 1984 through 1987. In 1988 she earned $13,387; in 1989 $15,600; and in 1990 $14,000, the younger child having been born in October. Since September of 1990 she has not been employed outside the home. Both parties confirmed that the decision for Defendant to stay at home with the children was a mutual one. She has maintained her medical license and remained current in Continuing Medical Education hours. Since commencement of this action she has thought about various types of possible employment and has begun to explore options in medicine and in related fields, being concerned also about meeting her responsibilities to the children (see Defendant's Exhibit S). She had one interview at the Social Security Administration for a position reviewing and testifying about medical records of pediatric clients, but she was not offered the job. Defendant does not want to be a treating physician as to do so would involve completing another two or three year residency in order to be employable and to meet her standards of care, another residency being viewed by her as impossible now with her diabetes and her responsibilities to the children. She wishes to explore options for "physicians in transition", working with her witness, Veronica Haker, in evaluation of her employment possibilities and development of a plan for her future.
 36. Plaintiff's expert witness, Barbara E. Burk, a vocational rehabilitation counselor (see Plaintiff's Exhibit 6), interviewed Defendant in October of 1997 and concluded she could re-enter the job market as a pediatrician in about a year and earn $80,000 to $100,000 annually, preceded by a "focussed job search" including volunteer work or being a substitute doctor ("locum tenums") to overcome her experience gap and to be a "linking experience" to bring her pediatric skills and knowledge current. Due to positives such as Defendant's ability to organize, her research interests, her intelligence and articulateness, her appropriate presentation of herself, her motivation, and her pride in her background and training, Burk believed she could offset the negatives of a substantial gap in employment and work experience. Burk has virtually no experience with physician placement and no knowledge of whether Defendant could obtain medical malpractice insurance. She believed "locum tenums" work would be available to Defendant and would provide the best experience as well as providing income during the search process, but she had no information about whether Defendant would be accepted should she apply for such work. (See Plaintiff's Exhibit 7.)
 37. Defendant's expert witness, Mark A. Anderson, also a vocational rehabilitation counselor (see Defendant's Exhibit L), interviewed Defendant in September of 1996 and concluded she would need an MBA in order to seek work in health care management, a field she informed him she was then interested in exploring. Due to her having only six months in 1982 of full time work experience in pediatric practice and no work in medicine at all since 1990, he believed she is not employable as a physician at present as she does not have current skills. In order to practice as a pediatrician, he believed she would need to repeat her residency, which would not be feasible or desirable for Defendant and which would not result in the likelihood of employment due to the competition for available positions. (See Defendant's Exhibit M.)
 38. Defendant's witness, Veronica Morgan-Haker, a physician's agent who is president of a corporation structured to assist physicians in career transition to find productive and satisfying careers (see Defendant's Exhibit N), interviewed Defendant in November of 1997 and concluded she is not currently employable in a pediatric practice because of her long absence from clinical practice, her limited work history, and her inadequate current knowledge of pediatric medicine. Haker believed it unlikely Defendant could secure malpractice insurance; therefore, she would not be employable in "locum tenums" situations and could not do volunteer medical work. Defendant is not marketable as a doctor at present. To become employable in pediatrics, she would need to repeat a two to three year residency, if she could be accepted for one given, the competition. Haker would not recommend this option to Defendant due to her family responsibilities and her health as well as the relatively small number of pediatric positions in relation to the numbers of job-seeking pediatricians. She projected several alternative tracks for Defendant to develop a viable career, each of which would require extensive retraining. Haker through Physician Opportunity Specialists offers an eight to twelve month self-assessment and career decision process at a cost of $17,500 for determining which track to pursue, to be followed after retraining by job placement services at additional similar cost. (See Defendant's Exhibit O.)
 39. Defendant's lost income production capacity over the period of this marriage has been immense as she has not practiced the profession for which she was extensively trained. She, however, has done little during the nearly twenty (20) months this cause has been pending to prepare for and/or to re-enter the job market (see Defendant's Exhibit S). Were she to have presented a decision to take one or another of the options she has thought about (accounting, health care management, law, etc.), aiding her in a definite plan addressing the time and expense necessary would have had parameters. What she did present was a desire to sort the decisions out with the assistance of Physician Opportunity Specialists. She would need to use liquid assets, awarded to her in the property division as set forth hereinbelow, in order to do so quickly and to initiate one or another retraining process. In Defendant's Exhibits Z and AA, Defendant projected an expense of $400 per month for a period of three (3) years as her "cost to re-enter job market."
 40. There will be minimal income derived by either party from the property division. Their income from all sources will be primarily from the earnings of Plaintiff until Defendant also becomes employed.
 41. Plaintiff's earning ability is vastly greater at present than that of Defendant.
* * *
 45. As one of the children is a teenager, who needs chauffeuring to activities and supervision "so he won't get in trouble", and the other is a seven year old, Defendant believes it is important for her to be available for them when they are not in school. She hopes to be as present for the younger child as she has been for the older and to be able to provide comparable opportunities for her. The fact that the children are in school provides Defendant the option to be employed, and/or to pursue becoming appropriately employable, during school hours.
 46. It is evident that Defendant's acceptance of familial obligations to the virtual exclusion of her own career development contributed extensively to Plaintiff's consistent progress in developing his earning ability over the years of this marriage.
 47. No evidence was presented directly as to the tax consequences of an award of spousal support. Certainly, the sum awarded will be taxable income to the recipient and an adjustment to income for the obligor.
 48. In Defendant's Exhibit AA, Defendant presented a projection of monthly expenses totaling $13,195. Given the present financial circumstances, including a degree of uncertainty about Plaintiff's employment future and the extensive projected time and cost to enable Defendant to become reasonably employed, not all of the listed expenses can be considered reasonable. Between $9,000 and $10,000 per month, including a sum to retire debts as delineated hereinbelow, would be more reasonable and appropriate in light of the standard of living enjoyed during the marriage. In Plaintiff's Exhibit 12, Plaintiff presented his monthly expenses. Eliminating sums for life insurance premiums and for Hawken School, his reasonable monthly expenses, including a sum to retire debts as delineated hereinbelow, total about $7,300. Whether the after-tax income to meet these projected reasonable expenses of the two households will be available in 1998 and thereafter was not capable of being definitively established at time of contested trial, but Plaintiff's employment history strongly suggests it will be likely to be available.
 49. Defendant seeks an award of attorney fees pursuant to O.R.C. 3105.18(H). As set forth on Defendant's Exhibit CC, she has incurred fees of $32,812.50 for services rendered at 187.5 hours at the rate of $175 per hour and expenses of at least $2,304.50 for a private investigator, a vocational expert, office expenses including copying costs, filing fees, transcripts, deposition costs, and expert testimony in the course of this litigation. Filing fee herein will be refunded by the Clerk of Courts, and filing fee regarding other litigation cannot be recovered herein.
 50. Defendant's attorney's credentials were stipulated as was the reasonability of the hourly rate requested.
 51. Until the signing of stipulations and agreements on the first day of contested trial, all issues were in dispute. Much time had been expended concerning matters eventually resolved in regard to the allocation of parental rights and responsibilities.
 52. During the course of this litigation Plaintiff was represented by three successive attorneys, causing delays and repetition in discovery matters. Prior to the entry of appearance by Plaintiff's present attorney of record, Defendant had filed a motion to compel production of documents and for attorney fees. Said motion was granted by entry journalized on March 18, 1997, at Vol. 2963, Pg. 716. In said entry sanctions and fees (Defendant's motion #299516) were reserved. Pursuant to Civil Rule 37(A)(4), Plaintiff's opposition to the motion to compel was not substantially justified nor were there any other circumstances which would make an award of attorney fees and expenses unjust. A portion of Defendant's attorney fee was incurred for additional work required to secure eventual compliance with discovery, requests. In addition, preparation for taking Plaintiff's deposition had to be repeated as said deposition was commenced then delayed for months before its completion.
 53. Although Defendant's attorney testified Defendant's Exhibit CC does not include all telephone calls nor all preparatory work, not every quarter-hour listed can reasonably be compensated within an award of attorney fees as spousal support.
 54. After the property division herein and the award of spousal support, both for sustenance and for support, Plaintiff will have the ability to pay fees as awarded. Although Defendant will have some ability to pay toward her attorney fees, she would have been prevented from fully litigating her rights and adequately protecting her interests without an award of reasonable attorney fees herein.
Thereafter, both parties filed objections to the Magistrate's Report. Husband's objections centered upon the following: (1) the finding that husband's income, for purposes of computing child support, should be imputed at pre-1998 levels without taking into account the fact that he was unemployed at the time of the hearing and the court did not factor in the positions and lowered salaries available to husband at the time of the hearing[4] (2) the finding that wife's income should be measured at zero dollars for purposes of computing child support; (3) the finding that husband was in arrears on paying temporary spousal support[5]
(4) the recommendation that wife be awarded the federal tax exemptions for the two minor children of the marriage since he would benefit more by receiving the exemptions; (5) the recommendation that wife be awarded her attorney fees. The wife's objections regarded the following: (a) that husband be found in arrears in the amount of $12,270.41 on paying temporary support; (b) that she be awarded child support in the amount of $4,718.52 per month [an amount which includes 2% poundage][6] (c) that $10,000 taken by husband prior to the filing of the divorce be identified as a marital asset and distributed accordingly; (d) that the marital debt be decreased by $2,248.29[7]; and, (e) that wife be awarded spousal support in an amount exceeding $12,000 per month for a period of five years.[8]
On October 15, 1998, the trial court issued its final order, a copy of which is attached to appellant's brief. Within this final order the trial court overruled the wife's objections to the Magistrate's Report in full, sustained in part the husband's objections (husband's objections numbers 1 and 2) to the Magistrate's Report relative to the income of the parties for purposes of computation of child support, and overruled the remainder of the husband's objections. See Journal Vol. 3271, pages 472-487. This final order awarded the marital residence to the wife and named the wife the residential parent and legal custodian of the children. The following marital assets were distributed by the trial court:
TO HUSBAND
 His 1994 Chrysler (with an existing lien of $7,148)[9];
 His Charter One Bank checking, savings and money market accounts (negligible value);
His Republic Savings Bank IRA (valued at $5,408.44);
His MES IRA and SEP (valued at $80,605.49);
 His National City Trust money purchase trust and plan EPS (valued at $5,215.61);
 His Putnam Money Market Fund CL-B (IRA rollover) (valued at $39,095.03)
The personalty as stipulated
 Whatever interest he may have in the life insurance policy on the life of his mother.
 TO WIFE
The marital home (net value of $53,382);
 Joint account at Ohio Savings Bank, #703-00-37683 (valued at $1,151.17);
Her account at Ohio Savings Bank (valued at $803.88);
 Her 1994 Mercury Villager minivan (with an exiting lien of $13,900);
The Israel Bond (valued at $431.25);
Her TransAmerica Life policy (valued at $2,607.83)
Her MFS IRA (valued at $3,806.60);
 Medpartners held by Prudential Securities, #AVG 093374-46 Jeffrey Beck (valued at $3,001.68);
 Husband's TransAmerica Life policy #92099957 (valued at $3,213.54);
 Husband's Columbus Life policy #300 5138 (valued at $18,755.63); and,
The personalty as stipulated.
Excluding the valuation of the automobiles, personalty and nominal items, a recapitulation of the remaining valuations set forth immediately above total $130,324.57 of marital assets awarded to the husband, and $87,153.58 awarded to the wife.
The trial court also ordered husband to pay "all of the debts listed on Exhibit A of Joint Exhibit 2; and whatever debts may be owed to his mother." Final Order at 11. This "Exhibit A of Joint Exhibit 2" is not included within the record. See fn. 3, supra.
Language within that final order which is pertinent to this appeal includes the following excerpts:
 The Court further finds there is an arrearage under the order for support pendent (sic) lite in the amount of $9,870.41, which arrearage should be retired by Plaintiff's payments to Defendant in monthly increments in addition to current child and spousal support as ordered hereinbelow.
 PURSUANT TO OHIO REVISED CODE 3109.04 AND 3109.051, THE Court further finds and concludes it is in the best interest of the minor children for parental rights and responsibilities to be allocated in accord with the stipulations of the parties, naming Defendant as the residential parent and legal custodian and allocating to Plaintiff the visitation schedule and other rights as set forth in Joint Exhibit 3, a copy of which is attached hereto and incorporated herein.
 PURSUANT TO OHIO REVISED CODE 3109.04 AND 3113.215, the Court further finds, in addition to the findings of fact and conclusions of law set forth by the Magistrate, that the evidence established Plaintiff has been self-employed for years. Even if, as Plaintiff argues, he only has gross base income of approximately $200,000, his history showed he has always worked more than a forty hour week. The evidence was that in his full time work in Georgia his rate was $130 per hour, which projected annually totals $270,000. He will certainly have no difficulty making at least $240,000. It is reasonable for computing child support to use an anticipated annual income from self-employment of $240,000. See worksheet attached hereto and incorporated herein. It would also be reasonable and appropriate in a changing circumstance of this type to use an average of income over a period of years (O.R.C. 3113.215(B)(5)(h)), as the Magistrate did.
 The Court further finds, in addition to the findings of fact and conclusions of law set forth by the Magistrate, that the evidence established Defendant, although highly educated, is not employable presently in the field for which she was trained years ago and she would need retraining in order to qualify for employment in any related field. At time of trial she had not secured work and had not yet begun retraining. She has experienced a great loss in earning capacity, caused by the mutual decision of the parties for her to devote her life to the children of the parties. There was no evidence offered concerning any work Defendant could be hired to do presently, concerning any income she could be expected to earn at this time, or concerning any available jobs — except for one at the Social Security Administration for which Defendant had been interviewed and not called back. Nonetheless, it is appropriate to impute some income to Defendant for purposes of computation of child support as it is true she could earn at a modest level over the next several years, earning in the range of $30,000 annually. See worksheet attached hereto and incorporated herein.
* * *
 The Court further finds if the personal exemptions for the minor children and the child tax credit were awarded to Plaintiff, they would be of less tax value than if awarded to Defendant because Plaintiff's income is high enough to trigger a phase-out of benefits. They should be awarded to Defendant at the present time, such award producing a net tax savings for the parties, thereby furthering the children's best interest. Singer vs. Dickinson, 63 Ohio State 3d 408 (1992).
 PURSUANT TO OHIO REVISED CODE 3105.171, the Court further finds "during the marriage" is the period between November 9, 1980, and June 1, 1996, a period of about fifteen (15) and one-half (1/2) years. The property division, as set forth below, is substantially equal as well as equitable.
 PURSUANT TO OHIO REVISED CODE 3105.18, the Court further finds, in addition to the findings of fact and conclusions of law set forth by the Magistrate, that there has consistently been a great disparity in the income of the parties with Plaintiff having a much greater earning capacity. Despite the high income of Plaintiff over the years of the marriage, there are very limited assets. Considering the contributions of Defendant to this family and the major diminution of her own earning ability by foregoing career opportunities in favor of her devoting her time and energy to household responsibilities, spousal support for her is both necessary and appropriate. She should certainly be compensated for the losses which have occurred in her earning potential as a result of her assumption of these responsibilities for maintaining the home and raising the children. O.R.C. 3105.18(C)(1)(m). Defendant's future income is uncertain due to her need for retraining and the development of a new career. Even with the imputation of a $30,000 gross income to her, Defendant's need for spousal support over the next five years is apparent in order for her to meet her reasonable expenses, determined by the Magistrate to be between $9,000 and $10,000 per month, while she seeks to retrain and to become employable at a reasonable level as well as to be available for the care of her children. If she were able to be employed earning $30,000 while engaging in a retraining process, her net income (inclusive of the taxable spousal support being awarded to her and the child support) is estimated to be in the range of $9,500 per month. The adjustment to Plaintiff's income by the payment of spousal support (all of said support being deductible to him) will diminish his taxable income. Assuming Plaintiff's self-employment income is only $240,000, his net income is estimated to be in the range of $5,000 per month for his household consisting of himself alone.
 After determining the division and disbursement of property under O.R.C. 3105.171, considering the factors set forth in the Magistrate's Decision and herein, and recognizing the support provided during the pendency of this action, Defendant's request for an award of spousal support, both for sustenance and for support, should be granted as appropriate and reasonable. Plaintiff should be ordered to pay to Defendant the sum of $5,000 per month as spousal support for a period of only five (5) years, despite the fact that this is a marriage of long duration, eighteen (18) years from date of marriage to journalization of this entry. The award of spousal support should terminate upon the earlier death of either party or the remarriage of Defendant/Wife and be subject to further order of Court within the term only in the event of a significant change of circumstances that cannot be foreseen or anticipated, which the Court determines to be Plaintiff/Husband becoming disabled and his income drastically diminished. Since the Plaintiff/Husband's income has fluctuated so significantly over the past several years and he has great control over his income, the Court is specifically finding that a modification cannot be made based on only one or two year's earnings of husband without other changes. The Court is also mindful of how contentious this action has been through the divorce proceedings. In fact, a motion to modify temporary support has already been filed by the Plaintiff/Husband in the time between the contested trial and the journalization of this entry.
Journal Vol. 3271, pages 473-476.
This timely appeal from that final order presents four assignments of error for review.
 I THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO PROPERLY CONSIDER ALL STATUTORY FACTORS IN DEVIATING FROM THE CHILD SUPPORT GUIDELINE SCHEDULE PURSUANT TO OHIO REVISED CODE § 3113.215(B) AND THEREBY ORDERING EXCESSIVE CHILD SUPPORT WHEN SAID ORDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In consideration of child-support appeals, this court is guided by an abuse of discretion standard. Booth v. Booth (1989),44 Ohio St.3d 142. An abuse of discretion implies that the trial court's attitude is arbitrary, unreasonable or unconscionable.Id. When "applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court." Powell v. Powell (1996), 111 Ohio App.3d 418.
Under current law, when the combined income of both parents is greater than $150,000, the court shall determine the amount of child support "on a case-by-case basis and shall consider the needs and the standard of living of the children who are subject of the child support order and of the parents." R.C.3113.215(B)(2)(b). In such cases, the appropriate standard for the amount of child support is "that amount necessary to maintain for the children the standard of living they would have enjoyed had the marriage continued." Birath v. Birath (1988), 53 Ohio App.3d 31,37.
The Ohio Support Guidelines provide that for a combined income level of $150,000 where two minor children are at issue, that $21,971 is to be payable for the children's support. See R.C.3113.215. In its Final Order, the trial court noted that, based on the child-support computation worksheet, the husband's computed annual child-support obligation was at least $18,719. See Final Order at 3. In the case sub judice, the trial court, while determining at page 3 of its final order whether the "basic computed sum would be unjust or inappropriate and not in the best interest of the children," identified a number of relevant factors upon which to base its deviation from the Guidelines and ordered husband to pay an annual child support amount of $48,960 (this amount represents $2,000 per month per child, plus 2% poundage). These factors in favor of deviation, which were determined to be applicable in both the Magistrate's Report and the trial court's final order, include the following:
 a. R.C. 3113.215(B)(3)(a) — special and unusual needs of the children;
 b. R.C. 3113.215(B)(3)(c) — other court-ordered payments[10];
 c. R.C. 3113.215(B)(3)(g) — disparity of incomes between parties or households;
 d. R.C. 3113.215(B)(3)(i) — the amount of federal, state, and local taxes actually paid or estimated to be paid by a parent or both of the parents;
 e. R.C. 3113.215(B)(3)(n) — the need and capacity of the child for an education and the educational opportunities that would have been available to the child had the circumstances requiring a court order for support not arisen.
Appellant-husband attacks the final order's deviation factors in turn on appeal.
In analyzing the child support award in light of these deviation factors, we note that the husband failed to object to the use of these, or any, deviation factors when he filed his objections to the Magistrate's Report. See Civ.R. 53(E)(3)(b). Accordingly, husband waived any error in the court's application of these deviation factors when computing the child support award.
Despite the use of the deviation factors, the question remains whether the overall child support award was excessive under the circumstances. Appellant complains that the child support award leaves him in a deficit position each month; stated differently, that after making all of the court-ordered payments, his monthly net take-home income is not sufficient to meet his monthly expenses which are identified in Plaintiff's Exhibit 12. See appellant's brief at 7-8. In short, husband argues that the trial court did not take into account his monthly expenses during the child-support award computation.
Husband's assertion is not supported by the record on appeal. The trial court took into consideration the monthly expenses of the husband when it fashioned the child-support award and calculated that, based on husband's gross income of at least $240,000 and the monthly expenses of the husband (some of which were considered to be unreasonable by the Magistrate), the husband would realize at least $5,000 in net income per month (or $60,000 annually). See Magistrate's Report at finding of fact 48; Final Order at 4. It is also significant to note that the trial court projected husband's gross annual income in Georgia to be $270,000, see Final Order at 2, which would, if realized, necessarily revise upwards the monthly net income of the husband by $2,500 per month ($270,000 — $240,000 = $30,000; $30,000 ÷ 12 months = $2,500). There being some competent evidence upon which the trial court could base its determination, we cannot say that the trial court abused its discretion in ordering that husband pay $5,000 per month, plus poundage, in child support.
The first assignment of error is overruled.
 II THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO PROPERLY CONSIDER THE IMPACT OF TAXES IN CONJUNCTION WITH THE OTHER COURT-ORDERED PAYMENTS, BY "COMPENSATING" DEFENDANT-APPELLEE WITH PAYMENT OF EXCESSIVE SPOUSAL SUPPORT.
In this assignment, husband argues that the trial court erred in compensating the wife through the award of spousal support for lost income production pursuant to R.C. 3105.18(C)(1)(m). See Final Order at 4 ("She should certainly be compensated for the losses which have occurred in her earning potential as a result of her assumption of these responsibilities for maintaining the home and raising the children.")
The husband next argues that the court erred when it did not consider the other court-ordered payments before awarding spousal support to the wife. The failure of the court to consider these other court-ordered payments caused, it is argued, an excessive award of spousal support.
Finally, this assignment argues that the spousal-support award was excessive and permitted the wife to perpetuate a luxurious standard of living which, given the changed condition of the marriage, should not be subsidized by an excessive award of spousal support.
The standard of review relative to an initial award of spousal support was stated in Southworth v. Southworth (Dec. 24, 1998), Cuyahoga App. No. 73525, unreported, 1998 WL 896293, at 3:
 When making an award of spousal support a trial court must consider the factors listed in R.C. 3105.18(C). On review, an appellate court must decide whether the trial court considered these factors and observe the following standard set forth in Terry v. Terry
(1994), 99 Ohio App.3d 228, 234:
 Alimony compromises two components: a division of marital assets and liabilities, and periodic payments for sustenance and support. Kaechele v. Kaechele (1988), 35 Ohio St.3d 93, 95. The court has equitable authority to divide and distribute the marital estate, and then consider whether an award of sustenance would be appropriate. Holcomb v. Holcomb (1989), 44 Ohio St.3d 128. The trial court has broad, but not unfettered, discretion in deciding what is equitable under the circumstances. Cherry v. Cherry (1981), 66 Ohio St.2d 348, 355. The trial court must set forth a factual basis or rationale which supports the award of spousal support. Id. This court cannot substitute its judgment for that of the trial court unless, under the totality of the circumstances, the trial court abused its discretion. Holcomb, supra. (Emphasis added.)
As noted in the Final Order at 4, the trial court stated that it relied on R.C. 3105.18 in making the award of spousal support. In that same passage from the Final Order, and indeed the remainder of the Final Order, the trial court, while relying upon the findings of the Magistrate, amply documented its application of many of the individual factors contained in R.C.3105.18(C)(1)(a)-(n). Despite appellant's arguments, the court is permitted pursuant to the express language of R.C.3105.18(C)(1)(m) to factor in the lost income production capacity of the wife which resulted from the wife's marital responsibilities in leaving her profession to raise the children and care for the home responsibilities. While the choice of words expressed by the trial court inferred that the wife was being compensated for the lost-income production, the fact remains that the totality of circumstances supports the spousal support award to the wife. Her income capacity, until retraining and/or refresher courses can bring her up-to-speed concerning contemporary advances in pediatric medicine, was severely diminished due to her being out of the workforce for an extended period of time. See Magistrate's Report at finding of fact 1, 34 and 35 (It could be argued that the wife lost over one million dollars in income by not working during just the final six years of the marriage). This diminished income capacity was addressed through the award of spousal support of limited duration. Also, the record does not support the assertion that the trial court failed to consider the other court-ordered payments in making the determination to award spousal support, when these other court-ordered payments were specifically addressed within the body of the Final Order. Finally, given the disparity of incomes and the distribution of the marital assets, it is an overstatement to characterize the wife's post-divorce standard of living as "luxurious." Based on a totality of the circumstances which are extensively reproduced earlier in this opinion through excerpts of the Magistrate's Report and the Final Order, we cannot conclude that the trial court abused its discretion in deciding to award spousal support or in determining the amount ($5,000 per month, plus poundage) and duration. (5 years) of that award.
The second assignment of error is overruled.
 III THE TRIAL COURT ERRED BY AWARDING THE TAX EXEMPTIONS FOR THE MINOR CHILDREN TO THE DEFENDANT-APPELLEE WHEN PLAINTIFF-APPELLANT WOULD REAP A GREATER SAVINGS, WHICH IS IN THE BEST INTERESTS OF THE MINOR CHILDREN.
In this assignment, husband argues that he should have been awarded the child dependency tax exemptions for the child support since he is in a higher tax bracket than the wife, and that this potential net savings by the parties was in the best interests of the children.
Under the Internal Revenue Code, the custodial parent is presumed to receive the tax dependency exemption. Will v. Will
(1996), 113 Ohio App.3d 8, 10, 680 N.E.2d 197, citing Section 152(e)(1), Title 26, U.S. Code. However, the court may award federal income tax dependency exemptions to noncustodial parents where it would produce a net tax savings for the parents, thereby furthering the best interests of the child. Singer v. Dickinson
(1992). 63 Ohio St.3d 408, 588 N.E.2d 806, paragraph two of the syllabus. The decision to allocate the exemption is a matter left to the discretion of the trial court. Will v. Will, supra, at 11.
In Singer v. Dickinson, supra, paragraph three of the syllabus states the following:
 3. In determining whether taxes would be saved by allocating the federal tax dependency exemption to the noncustodial parent, a court should review all pertinent factors, including the parents' gross incomes, the exemptions and deductions to which the parents are otherwise entitled, and the relevant federal, state, and local income tax rates.
In the case sub judice, husband did file an objection to the Magistrate's Report based on the award of the tax exemptions at issue. The reasons supporting that objection was a generalized belief that he would benefit more if given the exemptions since he would have the greater taxable income. Attached to these objections was a six-page bare-bones accounting exhibit of unknown origin, prepared on August 13, 1998, titled "Beck, Jeff, Summary Report," which apparently outlined a tax analysis of the parties using as its basis husband's taxable income of $200,000 and wife's taxable income of $0. No expert's report, or commentary or testimony of any type, explained the significance of the "Summary Report" exhibit, nor was this accounting exhibit used before the Magistrate. The use of this "Summary Report" to support the objection is not in accordance with the proper form for an objection to a Magistrate's finding of fact. Civ.R. 53(E)(3)(b), which details the form of objections, mandates that "[A]ny objection to a finding of fact shall be supported by a transcript of all the evidence submitted to the magistrate relevant to that fact . . ." Since there is no evidence to suggest that this "Summary Report" was submitted to the Magistrate at the hearing, the trial court was precluded from utilizing this "Summary Report" in ruling on the husband's objection regarding the tax exemptions. Instead, the trial court was bound to review the objection in light of the evidence submitted to the Magistrate at the hearing, which, in the casesub judice means a review of Plaintiff's Exhibit 18 (a copy of husband's 1996 federal tax return). See Magistrate's Report at finding of fact 7; Tr. 130-131. However, as stated previously at fn. 3, the record does not contain a collection of exhibits, one of which is Plaintiff's Exhibit 18. Absent this missing exhibit and any other exhibits admitted before the Magistrate detailing his financial/tax condition, it is impossible for this court to review the determination of the Magistrate in finding of fact 7, and the trial court's ultimate affirmance of that finding, that giving the husband the exemptions would have no effect on his taxes and that the net effect would benefit wife more by having the exemptions. Accordingly, we must conclude that the court acted properly in making its determination to award the wife the tax exemptions.[11]
The third assignment of error is overruled.
 IV THE TRIAL COURT ABUSED ITS DISCRETION BY ORDERING PLAINTIFF-APPELLANT TO PAY DEFENDANT-APPELLEE'S ATTORNEY FEES WHERE NO CORROBORATING EVIDENCE REGARDING THE REASONABLENESS OF THE FEES WAS PRESENTED; WHERE THE TRIAL COURT MADE NO FINDINGS OF FACT WITH REGARDS TO SUCH AN AWARD; AND WHERE SUCH A CONCLUSION WAS NOT SUPPORTED BY THE EVIDENCE.
In this assignment, appellant argues that the record does not provide sufficient evidence for the court to determine the reasonableness of the legal fees. Accordingly, appellant urges that the award of attorney fees was an abuse of discretion given the inadequate record.
With regard to wife's motion for attorney fees, the wife testified at the hearing before the Magistrate as follows:
 Q. Handing you what has been marked as Defendant's Exhibit CC, can you tell me what this is?
 A. It's an affidavit in support of the motion for attorney fees and cost.
 Q. And attached to that affidavit is there an Exhibit A?
A. Yes.
 Q. And that shows certain dates and services provided and hours spent in this case; is that right?
A. The hours and dates, yes.
 Q. And according to the last page of that exhibit, Carol, what is the last date entry that appears on this?
A. 1/12/98.
Q. What is the total number of hours?
A. 187-and-a-half.
 Q. I hope the math is correct. Although I see it as 182 in the mathematical part. Assuming 187.5 is correct, how much am I charging you an hour?
A. $175 an hour.
 Q. Okay. And the total amount for 187.5 hours would be how much?
A. $32,812.50 and that was based on 182 not 187.
 Q. Maybe, it is. We have to look at the math. I think it is 187.5.
 You also incurred other expenses for a private investigator and vocational expert in this case?
A. Yes.
 Q. There are some listings for transcripts of Jeff's deposition. Do you see that?
A. Yes.
Q. Do you approve of these expenses and costs?
A. Yes, I do.
 Q. What does the total bill come to not including the expert testimony that was elicited at trial?
A. As of today $35,117.
Q. Do you have the ability to pay that bill?
A. No, I do not. (Tr. 505-507)[12]
A short time later at the Magistrate's hearing, immediately prior to the wife's attorney testifying concerning his fee bill, husband's counsel stipulated to the opposing counsel's credentials and to the reasonableness of his hourly rate. Tr. 550-560. Thereafter, wife's attorney testified at length concerning the legal services incurred by the wife. Tr. 551-562.
The Magistrate's Report details its reasoning at findings of fact 49 to 54. The husband's entire objection and concurrent brief in support attacking that portion of the Magistrate's Report which touches upon the award of attorney fees is as follows:
 E. PLAINTIFF OBJECTS TO AWARDING DEFENDANT ANY ATTORNEY FEES.
 The evidence in this case was relatively straight forward. There were no discovery disputes, no complex issues and the parenting portion of the case was settled. There was no property to allocate which could readily make cash available. There was no debt, and the Plaintiff was allocated the majority. There is nothing compelling which warrants an award of attorney fees.
Plaintiff's Objections to the Magistrate's Report, at 13.
As part of the Final Order, at page 12, the trial court ordered the following in overruling the husband's objection regarding payment of attorney fees:
 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant's motion for attorney fees (#299516) is hereby granted.
 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff shall pay to Defendant the sum of $20,000 as additional spousal support toward attorney fees, for which sum judgment is rendered and execution may issue.
This court stated the following when addressing another divorce case which had an award of attorney fees as one of its issues:
 An award of attorney fees as spousal support can only be reversed if the trial court abused its discretion. Swanson v. Swanson (1976), 48 Ohio App.2d 85, 355 N.E.2d 894.
 When the court determines whether to award reasonable attorney fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating his rights and adequately protecting his interests if it does not award reasonable attorney fees.
 R.C. 3105.18(H). Attorney fees may only be awarded if it is shown that the payor spouse has a greater ability to pay. Farley v. Farley (1994), 97 Ohio App.3d 351, 355, 646 N.E.2d 875, citing Lee v. Lee
(1983), 10 Ohio App.3d 113, 460 N.E.2d 710.
* * *
 Attorney fees are awarded as spousal support, and in awarding such fees, the court must consider the factors of R.C. 3105.18(C). See Williams v. Williams
(1996), 116 Ohio App.3d 320, 688 N.E.2d 30. R.C. 3105.18(C) provides that any other relevant factor may be considered in determining spousal support.
Fraiberg v. Fraiberg (Dec. 3, 1998), Cuyahoga App. No. 73321, unreported, 1998 WL 842077, at 6-7.
A review of the record on appeal and a consideration of the factors contained in R.C. 3105.18(C), which are used to determine the reasonableness of the award of legal fees, supports the decision of the trial court to award attorney fees to the wife as spousal support. The earning capacity of the parties, at least for the short term, is disparate and wife is required to obtain retraining to be made employable as a physician in her chosen field of medicine. R.C. 3105.18(C)(1)(b) and (k). The wife is unable to pay the balance due on the legal fees she incurred whereas the husband does have the ability to pay her attorney fees. R.C. 3105.18(C)(1)(n). The husband received the majority of the marital assets in terms of valuation. R.C. 3105.18(C)(1)(n). The standard of living established by the parties during the marriage was above average. R.C. 3105.18(C)(1)(g). Also, contrary to the assertions of the husband, there were delays in the proceedings which were directly attributable to his actions in unjustifiedly opposing discovery, additional work to secure compliance with discovery requests, and securing multiple sets of counsel on his behalf which necessitated delay and duplication of correspondence and discovery. Finally, it must be reiterated that the record on appeal is incomplete as Defendant's Exhibit CC (wife's counsel's itemized fee statement presented at the Magistrate's hearing) is not in the record. Absent this crucial piece of evidence, it is impossible to determine at this stage whether particular items therein are, or are not, reasonable charges. Thus, we must defer to the trial court who did have that evidence before it when it affirmed the award of $20,000 (out of approximately $35,000 which was sought by the wife) in attorney fees and conclude that the record did contain sufficient evidence and the trial court did not abuse its discretion.
The fourth assignment of error is overruled. Judgment affirmed.
It is ordered that appellee recover of appellant her costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue but of this Court directing the Common Pleas Court, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
JAMES M. PORTER, A.J. and PATRICIA A. BLACKMON, J., CONCUR.
 _____________________________ JAMES D. SWEENEY, JUDGE
[1] The husband, who received his medical degree in 1978, is board certified in emergency room medicine and in pediatrics.
[2] The wife, who received her medical degree in 1978, is board certified in pediatrics.
[3] Although the Magistrate's Report mentions a number of exhibits which were submitted by the parties at the hearing, the record on appeal does not contain the collection of hearing exhibits which is to accompany the hearing transcript from the clerk's office. See App.R. 9(B)(7). It is the duty of appellant to ensure that the record on appeal is complete and transmitted in a timely fashion. Loc.App.R. 10.
[4] Husband argued in this objection that it was error to conclude that his income was $368,943. Husband urged that his income, for purposes of computing child support, should be determined to be no greater than $200,000 which was consistent with offers of employment made to him during interstate job searches at the time of the Magistrate's hearing.
[5] The Magistrate found that husband had a temporary support arrearage in the amount of $9,870.41, and recommended that this arrearage be paid down in monthly installments of $510. This recommendation was adopted in the court's final order. See Journal Vol. 3271, page 477.
[6] The Magistrate recommended that husband pay monthly child support in the amount of $4,080 (this monthly amount represents $2,000 per child plus 2% poundage). This recommendation was adopted in the court's final order. See Journal Vol. 3271, page 477.
[7] The Magistrate found the marital debt, excluding mortgages and automobile loans, equaled $144,554.45, of which $93,611.45 was attributed to the husband and $50,943 was attributed to the wife.
[8] The Magistrate recommended that husband pay spousal support of $5,000 per month, plus 2% poundage, for a period of five years. This recommendation was adopted in the court's final order. See Journal Vol. 3271, page 477.
[9] According to the Magistrate's Report, no evidence was presented on the fair market value of either of the parties' automobiles, therefore she determined that the vehicles were of equal value. See Magistrate's Report, at finding of fact 12.
[10] These court-ordered payments by husband include: providing health insurance for the children [which, according to the child computation worksheet, amounts to $4,212 per year, or $351 per month]; the payment of $510 per month [which includes 2% poundage] toward the total temporary support arrearage of $9,870.41; the payment of spousal support in the amount of $5,100 per month [which includes 2% poundage] for a five-year period; the payment of all debts listed on Exhibit A of Joint Exhibit 2, whose monthly maintenance of this debt is $2,071.91. Thus, the total monthly payment on these other court-ordered payments, the vast majority of which disappear in terms of liability in no more than five years assuming current payments, is $8,032.91.
[11] The court notes that this determination regarding the tax exemptions is open to modification by the trial court should a change of circumstances be demonstrated by husband at a later date.
[12] According to the wife's cross-examination testimony at the Magistrate's hearing, this was a total billing statement which did not reflect her payments of $7,500 toward legal expenses she incurred. See Tr. 524. Also, the private detective, who was hired by the wife subsequent to the husband serving divorce papers on her out-of-the-blue, was an item included within wife's motion for attorneys fees.